Matter of Carol Q. v Charlie R. (2024 NY Slip Op 04351)

Matter of Carol Q. v Charlie R.

2024 NY Slip Op 04351

Decided on August 29, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:August 29, 2024

CV-23-0740
[*1]In the Matter of Carol Q., Appellant,
v
Charlie R., Respondent. (Proceeding No. 1.)
In the Matter of Charlie R., Respondent,
v
Carol Q., Appellant. (Proceeding No. 2.)

Calendar Date:June 4, 2024

Before:Egan Jr., J.P., Clark, Reynolds Fitzgerald, McShan and Powers, JJ.

Lisa K. Miller, McGraw, for appellant.
Karen A. Leahy, Cortland, for respondent.
Jason M. Leifer, Ithaca, attorney for the child.

McShan, J.
Appeal from an order of the Family Court of Tompkins County (Scott A. Miller, J.), entered April 18, 2023, which, among other things, granted petitioner's application, in proceeding No. 2 pursuant to Family Ct Act article 6, for permission to relocate with the subject child.
Carol Q. (hereinafter the mother) and Charlie R. (hereinafter the father) are the parents of the subject child (born in 2020). In September 2022, an order of custody, entered upon the parties' consent, granted the father sole custody and placement of the child, with supervised parenting time to the mother. In November 2022, the mother filed a violation petition, alleging that the father had willfully refused her any parenting time with the child. In January 2023, the father filed a petition by order to show cause seeking permission to relocate with the child to Florida.[FN1] Following a fact-finding hearing on both petitions, Family Court dismissed the mother's violation petition and granted the father's relocation petition. As part of its order, the court provided the mother with certain supervised parenting time in Florida and New York and two weekly video calls. The mother appeals.[FN2]
Beginning with the mother's violation petition, we review Family Court's determination under an abuse of discretion standard with deference to its credibility assessments (see Matter of Harley K. v Brittany J., 189 AD3d 1738, 1739 [3d Dept 2020]; Matter of Carl KK. v Michelle JJ., 175 AD3d 1627, 1628 [3d Dept 2019]). The September 2022 custody order at issue provided the mother with supervised parenting time as agreed upon and arranged through the parties' attorneys. Deferring to Family Court's credibility determinations, our review of the record reflects that the mother had proposed the mother's stepfather as a potential supervisor on a single occasion and that the father rejected that proposal based upon the stepfather having aided the mother when she had previously failed to return the child after her parenting time. Indeed, the attorney for the child expressed similar reservations concerning the mother's stepfather serving as a supervisor. Although the mother suggests that she had proposed another individual, both the father and his attorney stated in court that they did not receive any other proposals from the mother identifying any other individual to supervise her parenting time.[FN3] Crediting those accounts, we find no abuse of discretion in Family Court's dismissal of the petition, as the mother failed to demonstrate that the father "defeated, impaired, impeded or prejudiced" her rights (Matter of Tamika B. v Pamela C., 187 AD3d 1332, 1338 [3d Dept 2020] [internal quotation marks and citation omitted]; see Matter of Steven OO. v Amber PP., 227 AD3d 1154, 1158 [3d Dept 2024]; compare Matter of Alexis WW. v Adam XX., 220 AD3d 1094, 1095 [3d Dept 2023]).
Turning to the father's relocation petition, as the party seeking to relocate, the father bore "the burden of establishing, by a preponderance [*2]of the evidence, that such relocation is in the child's best interests" (Matter of Faea OO. v Isaiah PP., 220 AD3d 1132, 1133 [3d Dept 2023], lv denied 41 NY3d 901 [2024]). The polestar inquiry remains the best interests of the child, with consideration of the relevant factors specific to relocation, including "each parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable parenting time arrangements" (id. [internal quotation marks and citations omitted]; see Matter of Aden HH. v Charish GG., 226 AD3d 1109, 1111 [3d Dept 2024]; Matter of Henry CC. v Antoinette DD., 222 AD3d 1231, 1232 [3d Dept 2023]). Importantly, "no single factor should be treated as dispositive," and the court's determination entails a holistic review of the totality of circumstances (Matter of Perestam v Perestam, 141 AD3d 757, 759 [3d Dept 2016]; see Matter of Tropea v Tropea, 87 NY2d 727, 738 [1996]). In reviewing its determination, we note that "Family Court is in a superior position to evaluate the testimony and assess witness credibility[; accordingly,] its credibility determinations and factual findings will not be disturbed if supported by a sound and substantial basis in the record" (Matter of Shane FF. v Alicia GG., 199 AD3d 1264, 1265 [3d Dept 2021]; see Matter of Faea OO. v Isaiah PP., 220 AD3d at 1133).
Upon our review, the record adequately supports Family Court's determination that the father met his burden of establishing by a preponderance of the evidence that relocation to Florida is in the child's best interests. To begin, there is no dispute that, at the time of the hearing, the father had been the child's primary caretaker for the majority of the child's life. As to the economic benefits of the move, the father testified to an increase in earnings since he relocated. Although the improvement in hourly wage was minimal, the father noted that he was able to work more hours and earn overtime. Further, crediting the father's account, the assistance he receives from the paternal grandmother and his stepfather, who live in close proximity to him in Florida, has greatly improved the resources he has to assist him in caring for the child. Although the attorney for the child points out that the father has siblings who reside in New York, there was no indication that any of them could assist with childcare responsibilities or facilitate the mother's supervised parenting time.[FN4] The father also indicated that his childcare costs had decreased as compared to New York. Importantly, the testimony at the fact-finding hearing established that [*3]the mother had not paid any child support and that the father was the child's sole economic provider, with no respite to that obligation on the horizon. Accordingly, the economic benefits arising from the move, such as the increase in take-home pay and change in state income taxes, are not insignificant. We therefore find no reason to disturb Family Court's determination to credit the father's account concerning the economic benefits of relocation for the child (see Matter of Faea OO. v Isaiah PP., 220 AD3d at 1135; see also Matter of Anthony F. v Kayla E., 191 AD3d 1108, 1109-1110 [3d Dept 2021], lv denied 37 NY3d 901 [2021]).[FN5]
As to the preservation of the relationship between the mother and the child, the record reveals that the parties' contentious relationship has seemingly precluded any ability to directly work together in arranging the mother's parenting time. Nevertheless, the mother's failure to exercise parenting time with the child since March 2022 up until the time that she filed her violation petition was mostly attributable to her own lack of effort. Further, the mother testified that she would like "a week or two" of parenting time unsupervised if she were not able to regain custody, which was not at issue in the proceedings. To this end, we note that Family Court granted the mother definite periods of parenting time, including three weeks in Tompkins County as well as one week in Florida at the father's expense, and the paternal grandmother indicated a willingness to facilitate parenting time with the mother in New York and in Florida. Moreover, the father raised no concern with arranging frequent video calls between the mother and the child. In line with these representations, Family Court fashioned an arrangement that provides the mother with definite parenting time that was not accounted for in the prior order (see Matter of Latoya B. v Marvin D., 191 AD3d 1123, 1125 [3d Dept 2021]; Matter of Anthony F. v Kayla E., 191 AD3d at 1110; compare Matter of Aden HH. v Charish GG., 226 AD3d at 1114).
Perhaps most significant, the record further reflects that the mother had put little effort into strengthening her own bond with the child since March 2022. In her testimony, the mother conceded that in August 2021 she had absconded with the child and only returned him after police intervention. Nevertheless, the mother continued to enjoy parenting time until March 2022, when the mother again did not appear for a scheduled drop off with the child without any notice to the father.[FN6] From that point, the mother made little to no effort to exercise any parenting time up until she filed her enforcement petition. In July 2022, a temporary order was entered providing for parenting time to the mother at a park and permitting the father to "monitor" the child from a distance but not otherwise interfere with the mother's time with the child. The mother again did not take advantage of any of her available parenting time under this order, testifying that [*4]she and the father "don't ever get along" and that the father had "put [her] down in front of" the child. She conceded, however, that she had not showed up to any of the scheduled parenting time at the park, which suggests that her concerns about the father rendering that parenting time arrangement untenable were speculative on her part. Moreover, the mother took no initiative to alter that arrangement, and when the September 2022 order was entered on consent and provided parenting time to the mother "as agreed upon and arranged through the attorneys for the parties," she only sought to exercise her right on a single occasion. All told, although we believe that the arrangement allowing the father to observe the mother's parenting time was ill-advised, the mother's efforts at exercising parenting time again were practically nonexistent up until the time that she filed her violation petition.
Further, although we agree with our dissenting colleagues insofar as Family Court should not have permitted the child to relocate prior to the fact-finding hearing, we do not believe reversal is required on that basis. To be sure, allowing relocation prior to the hearing precluded the mother from exercising any meaningful parenting time while relocation remained at issue and, to that end, it was improper to hold the period after that relocation against the mother. Nevertheless, it is clear from the record that the mother's efforts to see the child were minimal for an extended period of time beyond the period following the child's temporary relocation. We therefore do not find that this error is dispositive on the ultimate determination permitting relocation (see Thomas v Thomas, 271 AD2d 726, 727 [3d Dept 2000]). In sum, we find that Family Court paid due consideration to the appropriate factors and, although the record is not particularly robust, its determination allowing the father to relocate is supported by a sound and substantial basis (see Matter of Latoya B. v Marvin D., 191 AD3d at 1125; Matter of Cole v Reynolds, 110 AD3d 1273, 1276 [3d Dept 2013]; Matter of Kryvanis v Kruty, 288 AD2d 771, 772 [3d Dept 2001]; compare Matter of Amber GG. v Eric HH., 217 AD3d 1103, 1106 [3d Dept 2023]).[FN7]
That being said, the attorney for the child has raised various concerns with Family Court imposing a supervisory condition on the mother's parenting time and, in an exercise of our broad authority and on that discrete issue, we agree that the matter must be remitted for further fact-finding (see Matter of Erick RR. v Victoria SS., 206 AD3d 1523, 1526 [3d Dept 2022]). To this end, although the mother's failure to exercise her right to parenting time is largely attributable to her own inaction, the imposition of the supervisory requirement has clearly created a significant impediment. The prior instances of the mother failing to return the child after parenting time perhaps warranted the condition, however, the record before us is woefully inadequate with respect to the [*5]mother's purported mental health conditions and whether there would be a detriment to the child's safety, a necessary basis for requiring supervision (see David V. v Roseline W., 217 AD3d 1112, 1114 [3d Dept 2023], lv denied 40 NY3d 905 [2023]; Matter of Lynn X. v Donald X., 162 AD3d 1276, 1277 [3d Dept 2018]). Family Court acknowledges that the mother is currently undiagnosed, yet still expressly permitted her to request unsupervised parenting time if she obtained a mental health evaluation and followed through with any treatment recommendations.[FN8] In our view, the supervisory condition creates a significant restriction on the mother's ability to exercise her parenting time, particularly in light of the father's relocation, and unfairly places the burden on the mother to obtain a diagnosis and treatment without any guidance or assistance. In order to thoroughly resolve that concern, Family Court should have directed that such an evaluation occur (see Family Ct Act § 251) or at the very least directed the mother's assigned counsel to facilitate such an evaluation, taking into account the financial burden of doing so. Although we acknowledge that the decision to do so is subject to Family Courts' discretion (see Matter of Armstrong v Heilker, 47 AD3d 1104, 1105-1106 [3d Dept 2008]), because the court relied upon its assessment of an undiagnosed mental condition in continuing the supervised parenting time condition, the failure to resolve that issue without the benefit of an evaluation rendered its absence an abuse of that discretion. Accordingly, we remit this matter to Family Court for a fact-finding hearing specifically as to whether it is necessary that the mother's parenting time remain supervised, and that any determination be made with the benefit of the mother first undergoing a mental health examination.
In the meantime, as we previously noted, both the father and the attorney for the child have expressed concerns with the only readily identifiable person that the mother has suggested to supervise parenting time — the maternal stepgrandfather — acting in this capacity.[FN9] We take this opportunity to note the well-established presumption that maintaining and encouraging a relationship between both parents and a child is in the child's best interests, which is paramount to all other considerations (see Matter of Erick RR. v Victoria SS., 206 AD3d at 1526). Accordingly, foreseeing the potential for disruption of the mother's parenting time based upon only one individual being definitively approved as a supervisor, we caution the father not to unreasonably withhold approval of a different supervisor in the event that the paternal grandmother is unavailable. To this end, the parties should endeavor to identify other mutually agreeable individuals to supervise parenting time in short order so as to preserve the child's relationship with both parents pending further determination on the supervisory condition, and thereafter if such condition is maintained[*6].
Egan Jr., J.P., and Reynolds Fitzgerald, J., concur.
Clark, J. (concurring in part and dissenting in part).
We agree with the majority's conclusion that the record lacks support for Family Court's finding that Carol Q. (hereinafter the mother) "has serious mental health issues," and concur with the decision to remit the matter to determine the parameters of a parenting time schedule that would serve the best interests of the child. However, we respectfully dissent, as Family Court's broader credibility determinations and findings of fact underlying its order lack support in the record, and we believe that the relocation petition filed by Charlie R. (hereinafter the father) should not have been granted and that the order on appeal did not set forth meaningful parenting time for the mother. A review of the record leads us to have serious concerns that the child's relationship with the mother could be preserved with the child residing in Florida. Consequently, we would reverse the order on appeal and, based on the court's conduct and its effect on the proceedings, remit for a new hearing.
Initially, we must more fully set forth the background of these proceedings to provide some much-needed context. The mother and the father are the never-married parents of the subject child (born in August 2020). The mother also has two older children, each with different parentage. At the time of the fact-finding hearing, the oldest maternal half sibling (hereinafter the oldest sibling) was 10 years old and resided with his father, while the middle maternal half sibling (born in 2014; hereinafter the middle sibling) resided with the mother full time. In December 2020, the father commenced a proceeding seeking custody of the subject child pursuant to Family Ct Act article 6, and the parties were granted joint legal custody through a set of temporary orders. In August 2021, the mother alleged that the father had sent people to her home to threaten her; Family Court held an expedited evidentiary hearing and, upon finding that the mother had fabricated the allegations, temporarily granted the father sole legal and primary physical custody of the child and limited the mother to supervised parenting time, without any set schedule. The parties settled those matters on consent in September 2022 and, pursuant to the resulting order, the father was granted sole legal and primary physical custody of the child, while the mother had supervised parenting time, as agreed and arranged by the parties' attorneys; the parties were prohibited from having any direct contact with each other.
On November 4, 2022, the mother filed an enforcement petition asserting that she had been communicating with her attorney and providing him with dates and times when she and the maternal stepgrandfather (hereinafter the maternal grandfather) were available, but the father would not agree to allow her to see the child. Then, on January 6, 2023, the father filed an order to show cause and a petition [*7]seeking to relocate with the child from the Village of Groton, Tompkins County to the state of Florida. Family Court signed the order a few days later, granting the father permission to temporarily relocate with the child, without any input from the mother. Following a fact-finding hearing in April 2023, Family Court granted the father's petition to relocate and directed that the mother be permitted to exercise specified periods of parenting time, supervised by the paternal grandmother. On appeal, the mother and the attorney for the child (hereinafter AFC) contend that Family Court's determination lacks a sound and substantial basis in the record. The mother also argues that Family Court prejudged these matters.
In our view, Family Court engaged in a multitude of errors that left the mother with no meaningful parenting time and prejudiced her rights. First, the court erred from the outset when it granted the father permission to temporarily relocate to Florida. The father did not allege that any urgency existed which may have justified being granted temporary relief. Nevertheless, within days of the father filing the request, Family Court signed the order allowing the relocation, without hearing any evidence, without providing the mother notice or an opportunity to be heard and without making any provisions to ensure that the mother could have contact with the child, despite the mother's then-pending petition alleging that the father was interfering with her parenting time (see Obey v Degling, 37 NY2d 768, 769-770 [1975]; cf. Matter of Matthew TT. v Erin TT., 222 AD3d 1242, 1242-1243 [3d Dept 2023]; Matter of Liz WW. v Shakeria XX., 128 AD3d 1118, 1120 [3d Dept 2015], lv dismissed 25 NY3d 1195 [2015]). Such an action, which lacks any explanation in the record, causes us to question whether Family Court allowed its prior impressions of the parties to decide this matter before a hearing was even scheduled.
Second, Family Court's credibility determinations made at the conclusion of the fact-finding hearing are not supported by the record evidence. Family Court pronounced that the father was "entirely honest, perhaps scrupulously so" and that "[h]e doesn't appear capable of exaggerating." The court gave the father the benefit of every doubt by, among other things, ignoring glaring inconsistencies in his testimony and crediting his plainly exaggerated count of visits that the mother missed under a July 2022 temporary order along with his vague statements about the benefits of relocation. As to the mother, Family Court seemingly assumed the worst, disregarding the insight she displayed about her own shortcomings, such as her acknowledgment that her conduct in August 2021, including allegations she made against the father and absconding with the subject child, were inappropriate. The court also failed to consider the uncontroverted nature of much of her testimony; for example, in finding that the mother had failed to obtain a psychological evaluation required [*8]under a prior order, the court ignored the mother's testimony that she was regularly engaged in mental health counseling and that she had been unable to obtain an evaluation because she could not afford it.[FN10] "Although Family Court's findings are generally accorded great deference, they must be set aside when they are not supported by a sound and substantial basis in the record" (Matter of Jessica D. v Michael E., 182 AD3d 643, 644 [3d Dept 2020] [citations omitted]; see Matter of Rebekah R. v Richard R., 176 AD3d 1340, 1341 [3d Dept 2019]). On this record, we would find that Family Court's findings and credibility determinations lack a sound and substantial basis in the record and, consequently, we would not defer to them (see e.g. Matter of Shirreece AA. v Matthew BB., 166 AD3d 1419, 1422 [3d Dept 2018]; Matter of Stephen G. v Lara H., 139 AD3d 1131, 1134-1135 [3d Dept 2016], lv denied 27 NY3d 1187 [2016]).
The third and most glaring error was Family Court's ruling that the father established that it was in the best interests of the child to relocate to Florida. The evidence produced at the fact-finding hearing does not reflect sufficient facts on which the court could have granted the father's relocation petition. The "proposed relocation provides the change in circumstances that is ordinarily required to modify an existing custody order" (Matter of Faea OO. v Isaiah PP., 220 AD3d 1132, 1133 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 41 NY3d 901 [2024]; see Matter of Amber GG. v Eric HH., 217 AD3d 1103, 1104 [3d Dept 2023]). "The parent seeking permission to relocate with the child bears the burden of establishing, by a preponderance of the evidence, that the proposed relocation is in the best interests of the child" (Matter of Thomas SS. v Alicia TT., 206 AD3d 1534, 1535 [3d Dept 2022] [internal quotation marks, brackets and citations omitted]; see Matter of Clint Y. v Holly X., 217 AD3d 1069, 1071 [3d Dept 2023]). In assessing whether relocation is in the best interests of a child, Family Court must examine "the totality of the circumstances, including each parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's lives may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and the child through suitable visitation arrangements" (Matter of Michael BB. v Kristen CC., 173 AD3d 1310, 1311 [3d Dept 2019] [internal quotation marks, brackets and citation omitted]; see Matter of Brian VV. v Heather WW., 218 AD3d 860, 861 [3d Dept 2023]). The father testified that he had been the child's primary caretaker since the August 2021 expedited hearing, and he believed that Tompkins [*9]County was not a good area, so he sought to relocate to Hernando County, Florida to provide the child a better life, as that area had zero sex offenders and zero crime — a claim that he later admitted was not based on any statistical data. The mother opposed the relocation, as she believed it did not provide the child with any benefit and feared that the father would continue to interfere with her relationship with the child.
Prior to the April 2023 fact-finding hearing, the mother had not had any in-person parenting time with the subject child since March 2022.[FN11] Although both parents played a role in such extended absence, Family Court's temporary orders — which did not delineate a set schedule, required the mother's time to be supervised and allowed the father's temporary relocation — also negatively impacted the mother's ability to spend time with the child. The mother admitted that she failed to exercise specific parenting time set forth in a July 2022 temporary order, explaining that the order required her to be supervised by the father, whom she claimed would demean her in front of the child. The father, for his part, asserted that the mother had failed to exercise parenting time under said order for approximately 20 weeks; however, as the July 2022 order was only in place for approximately seven weeks, that assertion — which Family Court fully credited — is incredible. Upon repeated cross-examination by the AFC, the father put forth no plan for continued contact between the child and the mother, and he showed little to no interest in fostering any relationship between them.[FN12] Further, although aware that the mother could not afford a professional supervisor and that the maternal grandfather — her only familial resource — was deemed unsuitable, the father made no efforts to explore whether any of his family members could facilitate the mother's contact with the child.[FN13] We do not suggest that it is the father's responsibility to ensure that the mother exercises parenting time with the subject child, but his testimony and conduct indicate that he is unwilling to foster a positive relationship between the child and the mother (see e.g. Matter of Aden HH. v Charish GG., 226 AD3d 1109, 1112 [3d Dept 2024]; Matter of Christopher TT. v Lisa UU., 211 AD3d 1371, 1372 [3d Dept 2022]).[FN14]
The record also reflects no economic necessity for the relocation (compare Matter of Hoffman v Turco, 154 AD3d 1136, 1137 [3d Dept 2017]; Matter of Kryvanis v Kruty, 288 AD2d 771, 772 [3d Dept 2001]), and the father established, at best, only a minimal economic benefit. The father's claim that his salary "nearly doubled" by moving to Florida is belied by his own admissions that his hourly pay increased from $18 to $19.[FN15] Although he attempted to explain the discrepancy by asserting that Florida has no income tax and that he only worked 30-40 hours per week in New York but worked 50 hours per week in Florida, his assertion was unsupported by any documentary evidence (see [*10]e.g. Matter of O'Hara v DeMarsh, 161 AD3d 1271, 1274 [3d Dept 2018])[FN16] and, more importantly, the father admitted that he made no efforts to seek higher income in or near Tompkins County before moving to Florida (see Matter of Hill v Flynn, 125 AD3d 1433, 1434 [4th Dept 2015], lv denied 25 NY3d 910 [2015]; Rose v Buck, 103 AD3d 957, 961 [3d Dept 2013]; compare Matter of Hoffman v Turco, 154 AD3d at 1137). The remaining economic considerations are likewise unavailing, as the father's housing costs were comparable and he had reached rent-to-own agreements with the paternal stepgrandfather (hereinafter the paternal grandfather), who owned both of the father's New York and Florida rental properties, and the cost of the child's daycare was only slightly lower in Florida.[FN17] As to educational benefits, this factor is of minimal import at this time given the child's age. In any case, the father's testimony on this point was comprised of generalized, conclusory and unsupported claims (see Matter of Jelani PP. v Melissa QQ., 193 AD3d 1299, 1302 [3d Dept 2021]; Matter of O'Hara v DeMarsh, 161 AD3d at 1274).
The only factor that weighed at all in favor of the relocation petition is the child's relationship with the paternal grandparents, who reside in Florida and only spend about two months each year in New York visiting family and tending to the needs of the paternal grandfather's businesses. According to the father, he and the child moved to Florida the same day the order to show cause was signed — January 10, 2023 — and the two briefly lived with the paternal grandparents. After moving to a separate residence, the father and the child visited them two to three times per week, but the father denied needing the paternal grandparents for the child's day-to-day care. Indeed, the father testified that his job was flexible and allowed him to transport the child to and from daycare, where the child spent the entirety of the father's 50-hour work week. Although the record seems to reflect that the child shared a close bond with the paternal grandparents, Family Court weighed this factor so heavily that it improperly elevated those relationships above the child's relationship with the mother (cf. Matter of Hawkins v O'Dell, 166 AD3d 1438, 1439-1441 [3d Dept 2018]; Matter of Lina Y. v Audra Z., 132 AD3d 1086, 1087-1088 [3d Dept 2015]).
Furthermore, Family Court failed to give any consideration to the child's paternal family network [FN18] and maternal siblings in New York. "[T]he general rule that siblings should be kept together if possible has become more complicated due to changing family dynamics" (Matter of Bush v Bush, 104 AD3d 1069, 1073 [3d Dept 2013] [internal quotation marks, ellipsis and citation omitted]; accord Matter of Williams v Williams, 66 AD3d 1149, 1152 [3d Dept 2009]), but the law continues to "strongly favor[ ] the development and encouragement of sibling bonds" (Matter of Demers v McLear, 130 AD3d 1259, 1262 [3d Dept 2015] [emphasis added]; see Matter [*11]of Cole v Reynolds, 110 AD3d 1273, 1275 [3d Dept 2013]; see e.g. Matter of Brandon PP. v Shalalee QQ., 216 AD3d 1263, 1267 n 5 [3d Dept 2023]). The oldest sibling resides with his father in the Town of Marathon, Cortland County, and the mother exercises weekly parenting time supervised by that child's father. The mother explained that the subject child and the oldest sibling have not seen each other since their respective custodial schedules stopped aligning — approximately August 2021.[FN19] The middle sibling, who resided with the mother full time,[FN20] last interacted with the subject child in March 2022, during the mother's last visit. According to the mother, the two shared a close bond and played together, and the middle sibling would read books to the child and try to teach him to color. Family Court inquired as to the siblings' custodial arrangement but failed to consider the effect that granting relocation would have on the development or encouragement of a sibling bond, or the feasibility of crafting sibling visitation into any custodial schedule (see e.g. Matter of Brandon PP. v Shalalee QQ., 216 AD3d at 1267 n 5; Matter of Emmanuel SS. v Thera SS., 152 AD3d 900, 902-903 [3d Dept 2017], lv denied 30 NY3d 905 [2017]; Matter of Hill v Dean, 135 AD3d 990, 994 [3d Dept 2016]). Based upon the totality of the record on appeal, the only factor weighing in favor of relocation is that the child would have increased access to the paternal grandparents, with whom he shares a close bond. Considering the father's failure to establish that the proposed relocation would result in economic or educational benefits and his unwillingness to foster a positive relationship between the child and the mother, we are deeply concerned that the relocation would irreparably harm and hinder that relationship (see Matter of Keefe v Adam, 85 AD3d 1225, 1226-1227 [3d Dept 2011]; see also Matter of Heather NN. v Vinnette OO., 180 AD3d 57, 64-65 [3d Dept 2019]).
Furthermore, Family Court erred when invoking judicial notice [FN21] of "all past proceedings, testimony, interim and final decisions and orders upon stipulation and consent," expressing its intent to do so even if counsel objected. Family Court "may take judicial notice of its own prior proceedings and orders and is vested with broad discretion in determining the parameters for proof to be accepted at the hearing" (Matter of Jase M. [Holly N.], 190 AD3d 1238, 1242 [3d Dept 2021] [internal quotation marks and citations omitted], lvs denied 37 NY3d 901 [2021], 37 NY3d 901 [2021]; see Matter of Tara DD. v Seth CC., 214 AD3d 1031, 1034 n 3 [3d Dept 2023]; Matter of Lagano v Soule, 86 AD3d 665, 667 n 5 [3d Dept 2011]). Nevertheless, courts should be mindful that "[t]he mere presence of . . . documents in the court file does not mean that judicial notice properly can be taken of any factual material asserted therein" (Matter of Grange v Grange, 78 AD3d 1253, 1255 [3d Dept 2010]; see HSBC Bank USA, N.A. v Berdoe, 190 AD3d 840, 842[*12][2d Dept 2021]; Ptasznik v Schultz, 247 AD2d 197, 199 [2d Dept 1998]). Judicial notice of evidentiary facts [FN22] is limited to facts which are not subject to courtroom fact-finding because they are generally known or incontrovertible (see Michael R. Gianatasio, PE, P.C. v City of New York, 159 AD3d 659, 660 [1st Dept 2018]; Walker v City of New York, 46 AD3d 278, 282 [1st Dept 2007]; Matter of Crater Club v Adirondack Park Agency, 86 AD2d 714, 715 [3d Dept 1982], affd 57 NY2d 990 [1982]; cf. Affronti v Crosson, 95 NY2d 713, 720 [2001], cert denied 534 US 826 [2001]).
In its April 2023 bench decision, Family Court stated that it had also taken judicial notice of all "exhibits and evidence received." No exhibits were proffered or admitted during the hearing and, other than a reference to a police report and child protective caseworker notes, the record is devoid of any specifics as to what information or exhibits the court considered in its decision. Notably, Family Court recognized that it had never before held a fact-finding hearing regarding the subject child. Yet, in pronouncing its bench decision at the conclusion of the fact-finding hearing, the court read extensively from, and incorporated, the factual and credibility findings that it made after the August 2021 expedited hearing.[FN23] This was inappropriate, and courts should take care when exercising their discretion to take judicial notice of facts. We also note that none of the judicially-noticed documents or facts are reflected in the record on appeal, preventing meaningful appellate review (cf. CPLR 4511 [c]; CPLR 4532-b).[FN24]
Inasmuch as the mother contends that Family Court's conduct and rulings show that it prejudged this matter, we cannot agree, as Family Court has broad authority to control the courtroom and to rule on the admission of evidence, which may include questioning witnesses to help clarify testimony and expedite the proceedings (see Matter of Michelle L. v Steven M., 227 AD3d 1159, 1165 [3d Dept 2024]; Matter of Denise L. v Michael L., 138 AD3d 1172, 1173-1174 [3d Dept 2016]). However, the manner in which the court exercised said authority raises significant concerns about the fairness of the hearing. In addition to the court's overbroad use of the judicial notice doctrine and its unsupported findings, Family Court went beyond merely asking clarifying questions from witnesses. At one point, with no witness on the stand, the court elicited clarifying testimony by alternating questions between the mother and the father and, then, by also making related inquiries of the parties' counsel. At another point, as the court examined the paternal grandmother on the stand, Family Court turned to pose questions to the mother before returning to examine the paternal grandmother, in part based on the mother's answers. In our view, Family Court far exceeded its authority (see e.g. Matter of Washington v Edwards, 137 AD3d 1378, 1379 [3d Dept 2016]).
Finally, another significant error relates to [*13]the prior order and the mother's enforcement petition. Recognizing that the parties do not raise these grounds on appeal, the prior order was so fundamentally flawed that it cannot go unaddressed. As relevant here, the prior order granted the mother supervised parenting time as the parties could arrange through their counsel and prohibited the parties from otherwise communicating with each other. The practical effect of those terms is simple: in future proceedings, counsel must be recused, or risk being in the position of appearing as both a lawyer and a witness in such proceedings, in violation of Rules of Professional Conduct (22 NYCRR 1200.0) rule 3.7 (a).[FN25] That untenable scenario played out here, as exemplified by a confusing exchange that took place at the fact-finding hearing, where Family Court elicited testimony from counsel for both parties regarding the mother's attempts to exercise parenting time under the prior order. Specifically, the mother stated that she had contacted her counsel on several occasions suggesting the maternal grandfather as a supervisor and that she had suggested another supervisor on one occasion. The mother's counsel could not recall if a different supervisor was suggested but admitted that he stopped forwarding the mother's requests to the father's counsel because he knew that suggesting the maternal grandfather as a supervisor was futile. Here, the mother was placed in the position of having to testify as to her own counsel's failure to assist her in exercising parenting time, while still being represented by him, and her counsel's statements were elicited to contradict the mother's own testimony.
Based on the multitude of errors, the passage of time and the foregoing concerns, we would reverse the order on appeal in its entirety and remit this matter for a new hearing (see Matter of Theressa M. v Gaddiel M., 228 AD3d 1040, 1041 [3d Dept 2024]; Matter of Nicole B. v Franklin A., 210 AD3d 1351, 1354-1355 [3d Dept 2022], lv dismissed 39 NY3d 1092 [2023]; Matter of Nicole TT. v David UU., 174 AD3d 1168, 1172 [3d Dept 2019]), which should reach a determination "based on the best interests of the child and not a desire to punish a recalcitrant parent" (Matter of Aden HH. v Charish GG., 226 AD3d at 1113 [internal quotation marks, brackets and citations omitted]; see e.g. Matter of Richard T. v Victoria U., 159 AD3d 1071, 1073-1074 [3d Dept 2018]).
Powers, J., concurs.
ORDERED that the order is modified, without costs, matter remitted to the Family Court of Tompkins County for further proceedings to determine the need for a supervisory condition on the mother's parenting time, and, as so modified, affirmed.

Footnotes

Footnote 1: At that time, Family Court granted the father the ability to temporarily reside outside of the state with the child while the proceedings were pending.
Footnote 2: During the proceedings before Family Court, the attorney for the child sided with the father with respect to the mother's violation petition but did not take a position on the father's relocation petition beyond suggesting that the court craft a plan for the mother to have meaningful parenting time in the event that the court permitted the father to relocate. However, on appeal, the attorney for the child contends that Family Court should not have permitted relocation but takes the same position with respect to the mother's violation petition.
Footnote 3: We agree with the dissent's conclusion, and the underlying reasoning, that it was improper for Family Court to grant the mother parenting time solely as arranged through the parties' attorneys and that doing so was problematic relative to the mother's representation. However, the parties have not raised the issue on appeal, and we do not believe that the error requires reversal of Family Court's determination on the mother's enforcement petition.
Footnote 4: Relatedly, although there is some indication that one of the father's siblings who lived in relatively close proximity to the father had previously supervised the mother's parenting time, there is no record support that such person remained available and willing to do so. We therefore do not believe that his failure to propose his own family members as potential supervisors establishes his recalcitrance in fostering a relationship with the mother, particularly since the mother made no effort to propose those individuals herself.
Footnote 5: The father's testimony concerning his increased earnings in Florida and the number of times that the mother failed to show up for scheduled parenting time was occasionally inaccurate, and his assessment of the educational benefits or safety of the Florida community he was proposing to relocate to was generally misguided. In our view, however, these discrepancies or inarticulate statements do not reflect bad faith or an attempt to mislead on his part (see generally Matter of Raheem A. v Judith B., 189 AD3d 1716, 1719 [3d Dept 2020], lv denied 36 NY3d 908 [2021]; Matter of Christian M., 37 AD3d 834, 834 [2d Dept 2007]). Accordingly, we do not believe that the testimony identified by our dissenting colleagues rendered the father's testimony entirely unworthy of belief or otherwise provides sufficient justification to disregard Family Court's determination to find the father credible. Further, to the extent that the dissent points out that Family Court may have allowed its prior impressions of the parties to permeate its decision on this matter, we do not believe that doing so was impermissible or otherwise establishes that the court had prejudged the matter (see Matter of Kelley v VanDee, 61 AD3d 1281, 1284 [3d Dept 2009]; see also Matter of Lyons v Sepe, 163 AD3d 567, 569 [2d Dept 2018]).
Footnote 6: According to the mother, after discovering a bruise on the child the prior day, she took the child to the hospital. However, the mother provided no explanation as to why she waited to do so until the next day and at the exact time when she was obligated to return the child.
Footnote 7: The mother testified to prior interactions between the child and his two half siblings, one who lived with the mother and the other with whom she has supervised parenting time. There is no indication that the respective children had any contact with each other in the year preceding the hearing. Accordingly, while Family Court's failure to address these relationships as part of its decision was imprudent, there is scant proof in the record that the children were meaningfully bonded, particularly in light of their ages.
Footnote 8: Although the father suggests that the mother had previously admitted certain mental health diagnoses to Department of Social Services caseworkers, those reports are not in the record.
Footnote 9: During the fact-finding hearing, the mother raised the potential of a neighbor who occasionally assisted with childcare acting as a supervisor; however, she could not provide the individual's surname and there is no indication that she would agree to acting in that capacity.

Footnote 10: Through her enforcement petition, the mother sought financial assistance to obtain the psychological evaluation. If Family Court's concerns about the mother centered around "the mother ha[ving] serious mental health issues" (emphasis added) — an unsupported finding — the court was empowered to address such concern (see Family Ct Act § 251) and failed to do so.

Footnote 11: The record is unclear as to the circumstances that led to the mother being unable to exercise parenting time between March 2022 and July 2022, when a new temporary order was put in place. According to the mother's uncontroverted testimony, in March 2022, she discovered a bruise on the child's head that led her to call child protective services. She also took the child to the hospital, causing her to miss the scheduled custodial exchange. The child was never examined, as the father retrieved the child from the hospital within an hour of his scheduled parenting time. After a child protective investigation, the mother was informed that the bruise happened at daycare and did not present an underlying safety concern.

Footnote 12: As the majority points out, the AFC took no official position on whether Family Court should grant the father's relocation petition. However, the AFC argued that the father's case for relocation was "very weak" and that the only factor weighing in favor of relocation was that the paternal grandparents resided nearby. Ultimately, the AFC did not challenge the relocation because he believed that the father was the parent who was better suited to have primary physical custody of the child. On appeal, the same AFC represents the child, and he argues that the order on appeal is unsupported by a sound and substantial basis in the record.
Footnote 13: The father's unwillingness to foster a relationship between the child and the mother was also evidenced by his repeated efforts to vilify the mother. For example, he alleged that, when the child was an infant, the mother was "abusing him, throwing him down, screaming in his face, . . . [w]hipping him around, . . . smacking his head on the fridge and the chairs." Yet, despite Family Court's involvement in this case dating back to December 2020, the April 2023 hearing appeared to mark the first time that the father made such allegations. The record reveals no evidence of such conduct, indicated child protective reports (see Family Ct Act § 1034) or judicial findings of neglect or abuse against the mother.
Footnote 14: According to the AFC, during the pendency of this appeal, the mother's parenting time has not been occurring as directed, with the father positing that the mother shows little interest in the visits, and the mother reporting that the father's family has led her to believe that she is only entitled to one period of parenting time each of the weeks specified in the order, rather than parenting time each and every day of the listed weeks.
Footnote 15: The father initially testified that he earned $15 per hour at his last job in New York. When confronted with an affidavit he submitted in support of his relocation petition, wherein the father attested that his last hourly salary in New York was $18, he changed his testimony to align with that number.
Footnote 16: The father's appellate brief includes a calculation comparing his New York and Florida incomes. Although we cannot — and do not — rely upon the father's calculations, as they are outside the record, it is notable that said calculations put the increase in his income at approximately 50%, not double.

Footnote 17: In response to an inquiry from Family Court, the father testified that he was not receiving child support from the mother, and the mother acknowledged as much. The record is silent as to whether any child support order existed or whether the father had ever filed a petition seeking the same. Nevertheless, the record reflects that the mother had limited financial means, and, as of the hearing, was receiving unemployment benefits.
Footnote 18: According to the paternal grandmother, the child had two aunts, an uncle and seven cousins that live in or near Tompkins County, but no further details were elicited about the frequency or substance of the child's relationships with those individuals.
Footnote 19: The mother also testified that the relationship between these children was further hindered by adversity between the father and the oldest sibling's father.
Footnote 20: The middle sibling's father was incarcerated.

Footnote 21: The mother's counsel failed to object to Family Court taking judicial notice of various documents throughout the proceedings, rendering her appellate challenges thereto unpreserved (see Matter of Nevaeh N. [Heidi O.], 220 AD3d 1070, 1071-1072 [3d Dept 2023], lv denied 41 NY3d 903 [2024]), but we feel compelled to register our concerns as Family Court's decision relied heavily on the prior proceedings.
Footnote 22: Judicial notice of laws and legislative facts is governed by CPLR 4511.
Footnote 23: An expedited hearing necessarily results in preliminary findings that allow Family Court to issue a temporary order of custody to safeguard the best interests of children subject to its jurisdiction. While testimony and evidence elicited therein can certainly serve to impeach testimony, courts should be cautious to ensure that those preliminary findings do not usurp ultimate determinations that should only follow a full fact-finding hearing (cf. e.g. Rural Community Coalition, Inc. v Village of Bloomingburg, 118 AD3d 1092, 1095 [3d Dept 2014]; Matter of Twiss v Brennan, 82 AD3d 1533, 1534-1535 [3d Dept 2011]; Bonded Concrete, Inc. v Town of Saugerties, 42 AD3d 852, 855 n 2 [3d Dept 2007]; Jamie B. v Hernandez, 274 AD2d 335, 336 [1st Dept 2000]; Matter of Heisler v Gingras, 238 AD2d 702, 703 [3d Dept 1997]).
Footnote 24: Although not required, courts should consider admitting such documents as court exhibits.
Footnote 25: In the mother's petition, she asked to be assigned new counsel, as her current counsel had not helped her in her efforts to exercise parenting time. Family Court should have considered such request.